Greg Alan CANNON, Plaintiff,

v.

GARLAND COUNTY; Larry Selig, Garland County Sheriff; Lt. Roy L. Elliot (# 138); and D. Breizledine, on behalf of themselves and all others similarly situated, Defendants.

Civil No. 95–6018.

United States District Court, W.D. Arkansas, Hot Springs Division.

Oct. 9, 1996.

A.J. Kelly, Kelly Law Firm, Little Rock, AR, for plaintiff.

Ralph C. Ohm, Hot Springs, AR, for defendants.

Tim C. Humphries, Attorney General's Office, Little Rock, AR, for intervenor.

## JUDGMENT

HENDREN, District Judge.

### Introduction

Plaintiff, Greg Alan Cannon, brings this action seeking, *inter alia,* declaratory and injunctive relief based upon allegations that his constitutionally protected rights were violated when he was detained in excess of forty-eight hours without official hearing pursuant to Arkansas Code Annotated § 20–47–210(a). Plaintiff initially sought class certification with respect to the matter but that was denied by this Court's order of October 24, 1995.

Plaintiff alleges that he was detained by defendants during the early morning hours of Saturday, May 14, 1994, and held all that day (Saturday); the next day (Sunday); and then until about mid-day the following day (Monday, May 16, 1994) before he was given any sort of formal hearing in the nature of a probable cause hearing, an arraignment or a hearing on bail. Plaintiff says this conduct on the part of the defendants toward him violated his constitutionally protected rights under both the Fourth and Fourteenth Amendment to the Federal Constitution.

Plaintiff seeks relief under 42 U.S.C. § 1983, and requests declaratory and injunctive relief that the Arkansas statute [Ark.Code Ann. § 20–47–210(a) ] permitting detention pursuant to involuntary commitment proceedings for more than forty-eight (48) hours violates the Fourth and Fourteenth Amendments to the U.S. Constitution. He further asks that the Court enjoin defendants from future detention of any person for more than forty-eight (48) hours; that the Court award plaintiff nominal and actual damages in an amount less than required for federal diversity jurisdiction; and that he be awarded attorney's fees and costs.

Defendants admit plaintiff was taken into custody and held for involuntary commitment proceedings due to plaintiff's allegedly violent and potentially dangerous conduct during the early morning hours of Saturday, May 14, 1994. They deny violating plaintiff's rights and say he is not entitled to any relief against them.

Defendants answered together and generally admitted many of the operative facts of this case. Defendants do say, however, that the Arkansas statute setting forth procedures for involuntary commitment is constitutional on its face and that such statute and procedures were properly applied to plaintiff.

The case was presented to the Court, sitting without a jury, during the week of July 29, 1996, and after hearing testimony for the better part of one day on August 1, 1996, the Court took the case under advisement with the intention of advising the parties of its decision in writing.

### Jurisdictional Statement

1. This Court has subject matter and personal jurisdiction pursuant to the provisions of 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

### Findings of Fact

2. Based upon the pleadings, testimonies of witnesses, documents and other exhibits received into evidence, and the arguments of counsel, the Court finds the following relevant material facts to be established:

(a) The incident giving rise to plaintiff's complaint occurred within Garland County,

Arkansas in the Western District of Arkansas during the span of time extending from approximately 12:27 a.m. on Saturday, May 14, 1994, through approximately 1:00 p.m. on Monday, May 16, 1994.

(b) At all relevant times, plaintiff was a citizen and resident of Garland County, Arkansas; defendant Elliot was a Deputy Sheriff of Garland County, Arkansas; and defendant Selig was the Sheriff of Garland County, Arkansas.

(c) Plaintiff had mental problems in August of 1991, when he tried to commit suicide by slashing his wrists. At that time, plaintiff's mother tried—without success—to have plaintiff involuntarily committed to a mental facility for treatment.

(d) Between September of 1991, and May 14, 1996, plaintiff tried to commit suicide at least once.

(e) Commencing about 5:30 p.m. on Friday, May 13, 1994, plaintiff consumed approximately twelve beers, a "White Russian" and a quantity of sparkling wine.

(f) Plaintiff consumed the liquor at his mobile home which was in a mobile home park located at 170 Long Beach Lane, Hot Springs, Garland County, Arkansas, and, during the process, fired several rounds from a firearm through the front door, kitchen wall and floor of the said mobile home.

(g) At approximately 12:27 p.m. on Saturday, May 14, 1995, defendant Elliot and Corporal Rick Hutchins of the Garland County Sheriff's Office, responded to a call concerning shots being fired and went to plaintiff's residence. They first met with one of plaintiff's neighbors and heard shots being fired in the vicinity of plaintiff's mobile home while they talked.

Elliot and Hutchins observed numerous bullet holes in the door of plaintiff's home and plaintiff cursed them when they approached him there. He warned them to get away saying he wanted to kill both his estranged girlfriend and himself. After about an hour during which Elliot and Hutchins tried to convince plaintiff to quiet down, plaintiff promised them that he would stop shooting, put his gun away and go to bed. Whereupon, they left.

(h) Elliot and Hutchins got a second call about plaintiff at approximately 2:04 a.m. on the morning of Saturday, May 14, 1994, and again went to plaintiff's residence. The officers observed more bullet holes indicating that plaintiff had resumed shooting. He was brandishing a weapon and drinking when they arrived. Plaintiff insisted that he wanted to kill his estranged girlfriend and himself and a stand-off ensued. Finally, Elliot and Hutchins gained entry to plaintiff's home by asking permission to use the restroom. Once inside, they arrested and disarmed plaintiff without incident or injury to anyone.

(i) Other people were living near plaintiff's mobile home at the time he was shooting his firearm and they could have been injured by the bullets he fired.

(j) While plaintiff was being transported to the Garland County Detention Center (GCDC), he cried and told Elliot and Hutchins that they should have allowed him to kill himself. They told him he needed to get some help.

(k) Elliot and Hutchins were extremely friendly and kind toward plaintiff and treated him with respect. Plaintiff admits that the officers treated him better than he would have treated someone who exhibited his behavior had he been in their places.

(l) Defendant Elliot, as the arresting officer, concluded that the best course of action to follow concerning plaintiff was to seek help for him by getting him committed to a mental health treatment facility rather than by filing criminal charges against him by reason of his drinking, shooting and disturbance behavior.

(m) After getting plaintiff to the GCDC at approximately 2:19 a.m. on Saturday, May 14, 1994, Elliot prepared a petition for plaintiff's involuntary commitment to a mental health facility and placed it in the Jail Supervisor's incoming box for handling in accordance with established protocol of the Sheriff's office. That protocol provided that such petitions would be routed to the prosecuting attorney's office on the next business day to then be filed with the Probate Court of Garland County, Arkansas, on the next day when

that Court would be open to accept such filings. In this case, that "next day" was Monday, May 16, 1994.

(n) Plaintiff did not see either Elliot or Hutchins—during the weekend in question—after they delivered him to the GCDC and Elliot prepared the petition for plaintiff's involuntary civil commitment.

(o) At approximately 9:30 a.m. on Saturday, May 14, 1994, plaintiff was seen and evaluated at the GCDC by David Breizledine who is a mental health care professional employed as a counsellor with Community Counselling Services, Inc. (CCSI). At that time, it was Mr. Breizledine's opinion—based upon his review of all the paperwork, conversations with police officers and a conversation with plaintiff in his cell—that plaintiff should remain in custody at that time. He so advised GCDC officers.

(p) GCDC is a "designated facility" for the receipt of mentally ill persons and has a contractual arrangement with CCSI whereby a counsellor from CCSI is to be made available within a matter of hours to evaluate the condition of a person detained for alleged mental reasons with a view to determining whether the person should be held for formal commitment proceedings.

(q) Pursuant to CCSI's contractual arrangement with GCDC, it is Breizledine's practice to try to see a detained person within two hours after having been notified of the detention.

(r) Plaintiff remained in the GCDC until sometime Monday morning, May 16, 1994, when he was again seen by David Breizledine pursuant to the Order of the Probate Court of Garland County, Arkansas, acting on the petition of Elliot which had been filed that morning pursuant to the protocol of the GCDC for such matters.

(s) During plaintiff's stay at the GCDC over the weekend, he complains that he was deprived of water although he concedes he was given food on a regular basis. Captain Carl Lacey, a 19 year veteran of the Garland County Sheriff's Office, testified that there was no indication plaintiff's water to his cell was ever turned off during plaintiff's weekend stay and that there was no evidence he was deprived of water. Plaintiff does not suggest any reason why brother officers of those who had treated him kindly and with respect would cause him to be deprived of water or to be otherwise abused during his detention. Based upon the totality of the proof and taking into account plaintiff's admitted condition at the time of his incarceration, the Court believes the facts are that plaintiff was not mistreated during his detention.

(t) Elliot's petition concerning plaintiff was promptly processed and filed with the Probate Court of Garland County, Arkansas, on the morning of Monday, May 16, 1994, which was the first day said Court was open after plaintiff's detention began. That Court acted promptly and ordered plaintiff to be immediately evaluated on the morning of said May 16, 1994.

(u) When David Breizledine saw plaintiff on the morning of May 16, 1994—pursuant to Court order—he concluded that plaintiff was not a proper subject for involuntary civil commitment proceedings and recommended that he be released forthwith.

(v) Plaintiff was released from the GCDC at approximately 1:00 p.m. on Monday, May 16, 1994—almost 59 hours after he had been detained at 2:19 a.m. on Saturday, May 14, 1994.

(w) The petition filed by Elliot with respect to plaintiff was later dismissed.

(x) Plaintiff was not employed at the time of the incident and lost no income as a result of his detention.

## CONCLUSIONS OF LAW

3. The central question presented to the Court is whether plaintiff's detention violated due process under federal law. In answering that question, it must be first understood that "due process" under federal law may involve different requirements depending upon what particular situation is being considered. As was stated by the United States Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976):

" '[d]ue process', unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230] (1961). " '[D]ue process' is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972).

The above language implies that the standard of what is sufficient "due process" may vary with the type of situation being considered—such as whether the situation involves civil or criminal matters. The Court said that the three factors to be considered in determining what is specifically dictated by due process in a given situation are:

*First:* the private interest that will be affected by the official action;

*Second:* the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

*Third:* the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

After applying the three factors criteria to the facts before it, the Court decided due process did not require that, prior to the termination of Social Security disability benefits payment, a recipient had to be afforded an opportunity for an evidentiary hearing.

In *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Supreme Court was concerned with the question of what standard of proof is required by due process in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital.

The Court recognized that a civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. *Id.* at 425, 99 S.Ct. at 1808–09. Also, citing *Mathews v. Eldridge,* the Court said that in considering what standard (of proof) should govern in a civil commitment proceeding, it would have to assess both the extent of the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed under a particular standard of proof as well as be mindful that the function of legal process is to minimize the risk of erroneous decisions. *Id.* at 425, 99 S.Ct. at 1808–09.

The Court summarily rejected the notion that the standard of "beyond a reasonable doubt"—as used in criminal proceedings—should also be used in civil commitment proceedings, saying:

There are significant reasons why different standards of proof are called for in civil commitment proceedings as opposed to criminal prosecutions. In a civil commitment state power is not exercised in a punitive sense. (footnote omitted). Unlike the delinquency proceeding in [*In re* ] *Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ], a civil commitment proceeding can in no sense be equated to a criminal prosecution. Cf. *Woodby v. INS,* 385 U.S. [276] at 284–285 [87 S.Ct. 483, 487–488, 17 L.Ed.2d 362].

In addition, the "beyond a reasonable doubt" standard historically has been reserved for criminal cases. This unique standard of proof, not prescribed or defined in the Constitution, is regarded as a critical part of the "moral force of the criminal law." *In re Winship,* 397 U.S., at 364 [90 S.Ct., at 1072], and we should hesitate to apply it too broadly or casually in noncriminal cases. Cf. *ibid.*

The heavy standard applied in criminal cases manifests our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free. *Patterson v. New York,* 432 U.S. 197, 208 [97 S.Ct. 2319, 2326, 53 L.Ed.2d 281] (1977). The full force of that idea does not apply to a civil commitment. It may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction, 5 J. Wigmore, Evidence § 1400 (Chadbourn rev. 1974). However, even though an erroneous confinement should be avoided in

the first instance, the layers of professional review and observation of the patient's condition, and the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected. Moreover, it is not true that the release of a genuinely mentally ill person is no worse for the individual than the failure to convict the guilty. One who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma. See Chodoff, The Case for Involuntary Hospitalization of the Mentally Ill, 133 Am. J. Psychiatry 496, 498 (1976); Schwartz, Myers & Astrachan, Psychiatric Labeling and the Rehabilitation of the Mental Patient, 31 Arch. Gen. Psychiatry 329, 334 (1974). It cannot be said, therefore, that it is much better for a mentally ill person to "go free" than for a mentally normal person to be committed.

Finally, the initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basis issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists. Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous. (cites omitted).

*Id.* at 428, 429, 99 S.Ct. at 1810, 1811.

After a thorough analysis—which essentially followed the three factors analysis of *Mathews v. Eldridge*—the Court concluded that the proper burden of proof in a civil commitment proceeding should be the "clear and convincing" standard although the states would be free to require a higher standard if they chose. Thus, it will be seen that the Supreme Court has declined to hold that "due process" is necessarily the same in a civil commitment proceeding as in a criminal proceeding.

7. In the case at bar, plaintiff insists that the question of whether he was given due process in connection with his stay in the Garland County Detention Center while being processed on a petition for involuntary civil commitment should be governed by the case of *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). The Court does not agree.

In the introductory paragraph of *Riverside,* the Court stated:

In *Gerstein v. Pugh,* 420 U.S. 103 [95 S.Ct. 854, 43 L.Ed.2d 54] (1975), this Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. This case requires us to define what is "prompt" under *Gerstein.*

*Id.* at 47, 111 S.Ct. at 1665.

The Supreme Court then held that—as a general rule—due process requires a judicial determination of probable cause within 48 hours of the arrest of a person being charged with criminal conduct.

Both *Gerstein* and *Riverside* were criminal cases wherein the issue of due process related to the situation where a person is arrested and charged with a violation of law—neither related to civil commitment proceedings and neither cited either *Mathews v. Eldridge* or *Addington v. Texas,* both supra. It should also be noted that the 1979 case of *Addington v. Texas* (which *was* a civil commitment proceeding) did not cite or allude to *Gerstein* which was decided in 1975. Accordingly, there is no rational basis for this Court to assume that the Court intended *Riverside* to overrule or modify either *Mathews v. Eldridge* or *Addington v. Texas.*

The parties have not cited—and this Court has not found in its research—any *Supreme Court case* addressing the precise issue now under consideration. This Court, therefore, believes that it must look to the last cited Supreme Court cases—and not to *River-*

**1374**

side—for guidance in determining the issue before it. Accordingly, the Court believes it should apply the three factors test of *Mathews v. Eldridge* as well as the rationale the Supreme Court used in *Addington v. Texas* (to conclude that the standard of proof required for due process in a civil commitment case should not be the same as in a criminal case) when examining the issue of whether the time frame for a probable cause determination in a civil commitment case specified by Arkansas law comports with the level of due process which ought to be required in such proceedings.

4. As it happens, this very issue has already been addressed by a federal court sitting in Arkansas—with respect to the prior law which was in place before the advent of Ark.Code Ann. § 20–47–201, *et seq.*. It is therefore appropriate to first examine that holding.

Prior to the enactment of the present statute (Ark.Code Ann. § 20–47–201, *et seq.*), the U.S. District Court for the Eastern District of Arkansas approved and ordered implemented an agreement calling for certain time frames for probable cause determinations in civil commitment cases in Arkansas. *Wessel v. Pryor,* 461 F.Supp. 1144 (E.D.Ark.1978). Observing that past legislative efforts had not resulted in procedures which met federal constitutional standards, Chief District Judge G. Thomas Eisele approved an agreement between the parties in that case which contained minimum constitutionally acceptable procedures and directed that those procedures were to be followed in Arkansas only *until the legislature acted. Id.* at 1146. He also made it clear that the policy and procedures of the State of Arkansas with respect to the handling of civil commitment cases are issues of legislative concern and matters of legislative prerogative to be resolved by the General Assembly of the State of Arkansas without interference by federal courts as long as the implementation of such policy and procedures do not offend provisions of the federal constitution. *Id.* at 1145, 1146.

In *Wessel,* which was handed down on December 11, 1978—Judge Eisele said that the law in Arkansas governing involuntary civil commitments (§ 59–401, *et seq.*) was not

unconstitutional on its face since it *could* be constitutionally applied. However, he insisted that constitutionally adequate procedures be put in place until such time as the legislature could act—presumably to revise the law so that it would, at least, comply with minimum requirements of due process under the federal constitution. The agreement which he approved—as meeting *minimum* constitutional standards—provided as follows:

\* *Non–Emergency Situations:* The subject of a petition had to be brought before the probate judge (the "initial appearance"):

^*Forthwith*—if the subject was *not* in custody; or

^If the subject *was* in custody—*within twenty-four hours of the time he was taken into custody, excluding weekends and holidays.*

\* *Emergency Situations:* The subject could be detained if at least one of the standards for involuntary civil commitment (as defined in the agreement) applied, and if so detained:

^A petition for commitment had to be filed at the *first available opportunity* in the probate court;

^The *first available opportunity* was defined as: *the first twenty-four hour period following detention, excluding weekends and legal holidays;* and

^The subject had to be afforded an "initial appearance" in court within *twenty-four hours (excluding weekends and legal holidays) of the filing of the petition,* or the subject had to be *released.*

\* *Probable Cause Hearing:* As to both non-emergency and emergency situations, the agreement provided that, within *seventy-two hours* of the initial appearance of a subject—as required by the protocols for non-emergency and emergency situations—the subject "shall again be brought before the court to determine whether there is probable cause to believe that the [subject] is mentally ill and that one of the standards for involuntary civil commitment applies to the respondent."

*Id.* at 1146, 1147

5. Although *Mathews v. Eldridge,* supra, had been decided some three years before

*Wessel,* there is no indication that Judge Eisele utilized its three factor analysis in reaching his conclusions as to what was required for due process with respect to civil commitments in Arkansas. However, this Court believes that the decision is clearly supported by such an analysis:

(a) *Private Interest:* While detaining an individual poses a significant curtailment of individual liberty, this privacy interest is outweighed by the government's interest in protecting both the citizen and the people in general from dangerous and/or irrational conduct—this is especially true where the law and courts implementing it impose stringent standards on such detainments to insure expeditious, fair and constitutionally acceptable handling of the matter.

(b) *Risk of Erroneous Deprivation:* While in a criminal case the risk of error must be minimized even at the risk that some who are guilty may go free, this is not necessarily true in a civil commitment case. The purpose of a civil commitment is not to punish but, rather, to aid and assist. Mandatory professional review, concern of family and friends, and a statutorily mandated attitude on the part of those asserting custody that the person is being held not to punish but to help, all work together to promote an early end to detainment whether initially erroneous or not.

(c) *Government's Interest:* The public interest obviously is implicated in a civil commitment matter. There is a legitimate concern that mentally ill or unstable persons should not be permitted to injure themselves or others. The public interest also includes the administrative burden and other societal costs which are incurred when the government acts—through its servants—in such matters. While the administrative and societal costs attendant upon compliance with minimum constitutional standards are not insubstantial, the public interest would not be served if such were not incurred in order to ensure that both individuals and the public in general receive fair treatment in the matter. On the other hand, it is not believed that the public or private interests involved require the more speedy and intensive handling of individuals charged with criminal offenses in the nation's justice system. *See,* generally, *Mathews v. Eldridge,* supra; and *U.S. v. Wallace,* 845 F.2d 1471 (8th Cir.1988) for a discussion of the three above factors.

6. This Court believes that *Wessel:*

(a) clearly specified the framework for the protection of the minimum constitutional rights which must be afforded to an individual who is the subject of an involuntary commitment proceeding;

(b) clearly indicated that "the parties charged with the duty of applying these procedures" were free to formulate alternatives which *go beyond the minimum constitutional standard specified in the Agreement and Stipulation* which was then being approved by the Court; and

(c) clearly implied that any alternatives to the minimum standards therein set out which might be formulated in the future by the Arkansas General Assembly would have to at least meet and not fall below those standards.

7. In determining whether current Arkansas statutes now reflect "the law" on due process requirements in civil commitment proceedings—as contemplated by *Wessel*—or whether the *Wessel* opinion, itself, still reflects the same, the Court must consider whether changes in the statutory law accomplished after *Wessel* meet the requirements therein laid down. A short review of the history of the present statutory provision will, perhaps, be helpful in this analysis.

(a) Ark.Stat.Ann. § 59–401, *et seq.,* (which was the statutory provision in effect when *Wessel* was decided) said nothing about any "initial appearance" or any time frame for the handling and disposition of petitions for involuntary civil commitment cases. It merely provided that "... (the) court shall hold a hearing either in regular term or in vacation in chambers ...." [See § 59–408(A)]. Thus, before *Wessel* was decided, there was no time frame prescribed by statute for a hearing on probable cause or, for that matter, for a final hearing to determine whether a person should be involuntarily committed.

(b) After *Wessel* was handed down on December 11, 1978, the Arkansas Legislature adopted Act 817 of 1979, (codified as Ark. Stat.Ann. §§ 59–1401, *et seq.*) which superseded the previous statutory provisions on involuntary civil commitment and provided, in pertinent part, as follows:

\* *As to Subjects Not In Custody:* A hearing must be held within three (3) days of the filing of the petition for civil commitment [*See* § 59–1405(a)(1) ]; and

\* *As to Subjects In Custody:* A petition for involuntary civil commitment must be filed *"within seventy-two hours"* (presumably after detention of subject); and a hearing must be held within three (3) days after the filing of the said petition. [*See* § 59–1406(a); and § 59–1405(a)(1) ].

As far as this Court can determine, no challenge to these provisions of the 1979 Act was ever made. Accordingly, there was never an occasion for any Court to determine whether these provisions were in compliance with the minimum standards required by *Wessel.* It should be noted, however, that these provisions in the 1979 Act said nothing about any "initial appearance" nor did they mention "exclusive of weekends and legal holidays" in connection with the computation of time periods.

(c) Eleven years later—By Act 861 of 1989, (codified as Ark.Code.Ann. §§ 20–47–201, *et seq.*)—the Arkansas Legislature again made changes to the civil commitment laws:

\* § 59–1405(a)(1) was redesignated as § 20–47–209(a)(1), and amended to insert the words: *"excluding weekends and holidays"* after the words: "within three (3) days"; and

\* § 59–1406 was redesignated as § 20–47–210(a)(1), and amended to insert the words *"excluding weekends and holidays"* after the words "within seventy-two hours."

The main result of the 1989 amendment apparently was to extend the time a person could be held under the statute without a petition being filed concerning him and a probable cause hearing being given to him. As far as this Court knows, there has not been a challenge to the present statutory provisions prior to this case and no court has previously been asked to determine if they satisfy the requirements of due process as mandated by *Wessel.*

Ark.Code.Ann. § 20–47–209(a)(1) therefore now provides, with respect to a person concerning whom a petition for involuntary civil commitment has been filed but who is *not* in custody, the following with respect to a hearing:

... [An initial] hearing shall be set by the court *within three (3) days, excluding weekends and holidays,* of the filing of the original petition. (Emphasis added)

and Ark.Code Ann. § 20–47–210(a)(1) now provides, with respect to a person who *is* detained, the following with respect to a hearing:

... A petition ... shall be filed in the probate court of the county in which the person resides or is detained *within seventy-two hours, excluding weekends and holidays, and a hearing, as provided in § 20–47–209(a)(1) shall be held.* (Emphasis added)

8. On the face of the matter, it would appear that the present statute would permit longer time frames than *Wessel* would allow. If so, that is a matter of serious concern to this Court because a reading of the *Wessel* opinion will show that Judge Eisele was quite serious about the time frames he felt were required in order to meet the requirements of due process.

(a) For example, the defendants there first agreed that a probable cause hearing must be held within 72 hours after the initial appearance—which itself could occur from 24 to 48 hours after confinement. Then, said defendants tried to withdraw from that agreement and to suggest that the probable cause hearing must be held only within seven (7) days (*i.e.,* 168 hours) of the initial appearance. The Judge rejected the effort saying:

As was true upon the original approval of the "Agreement and Stipulation," the Court sees no constitutional infirmity in the 72 hour period. It has further concluded, after reflection, that it should not permit the state defendants to withdraw from the earlier agreement with respect thereto. Therefore, the language of the

agreement on this point, as reflected in Exhibit A, will not be changed.[1]

*Id.* at 1145.

(b) As a second example, the *Wessel* defendants also attempted to back away from an agreement with respect to the time in which a petition must be filed concerning a person who was detained. Judge Eisele rejected this attempt to change what he considered to be a time frame necessary to comply with due process requirements. He said the following:

The parties also agreed at one point, as a new provision, to define the "first available opportunity" at which a petition for commitment must be filed, after the respondent has been taken into custody in an emergency situation, as the first 24 hour period following detention. The state defendants now desire that the "first available opportunity" be defined as the first 48 hour period following detention. *The Court can discern no reason why a person taken into custody on an emergency basis should be deprived of his liberty for as long as two days before the filing of a proper petition* ... (Emphasis added)

*Id.* at 1145.

(c) Moreover, the Court also notes the following difficulties with § 20–47–210(a)(1) when compared with *Wessel:*

(1) there does not appear to be any provision for an "initial appearance" of a respondent within 24 to 48 hours of confinement;

(2) it appears that—instead of being required to file a petition at the first available opportunity following detention (*i.e.,* within the first 24 hours following detention, exclusive of weekends and holidays) and then being required to provide the respondent with an "initial appearance" in court within twenty four hours, exclusive of weekends and holidays, after the filing of the petition as required under *Wessel*— it is only required that a petition be filed

within 72 hours after detention, exclusive of weekends and holidays; and

(3) it appears that a hearing need only be set within three (3) days, exclusive of weekends and holidays, after the petition is filed.

■ 9. After careful study, this Court has concluded that the present statutory requirements do not comply with the minimum due process requirements set in *Wessel* and the following example will perhaps illustrate why the Court has so concluded:

Suppose that a subject is detained at 10:00 p.m. on a Friday evening and that the following Monday is a legal holiday.

(a) Under the present statute, the subject could be "legally" held until 10:00 p.m. the following *Thursday* night without a petition being filed. That conclusion is based upon the following reasoning:

* Time elapsed since detention at 10:00 p.m. Friday:

| | | |
|---|---|---|
| Friday: | 2 hours | |
| Saturday: | 24 hours | (excluded as weekend) |
| Sunday: | 24 hours | (excluded as weekend) |
| Monday: | 24 hours | (excluded as holiday) |
| Tuesday: | 24 hours | |
| Wednesday: | 24 hours | |
| Thursday: | 22 hours | |
| | | |
| Total | 144 hours | |

(b) Under *Wessel,* the subject could be "legally" held only until 10:00 p.m. the following *Tuesday* night without a petition being filed. That conclusion is based upon the following reasoning:

* Time elapsed since detention at 10:00 p.m. Friday:

| | | |
|---|---|---|
| Friday: | 2 hours | |
| Saturday: | 24 hours | (excluded as weekend) |
| Sunday: | 24 hours | (excluded as weekend) |
| Monday: | 24 hours | (excluded as holiday) |
| Tuesday: | 22 hours | |
| | | |
| Total | 96 hours | |

■ (c) If it be assumed that a petition is filed on the subject [not at the *first available opportunity* as required under *Wessel* but, rather, within the time frame permitted by Ark.Code.Ann. § 20–47–210(a)(1) ] at 4:00 [2] P.M. on the following Thursday, the subject could be "legally" detained without having

---

**1.** That language reads: "Within seventy-two hours of the initial appearance of the respondent before the court, the respondent shall again be brought before the court to determine whether there is probable cause to believe that the respondent is mentally ill and that one of the

standards for involuntary civil commitment applies to the respondent." *Id.* at 1147.

**2.** Under the example, it could be argued that a petition could be filed as late as 10:00 p.m. However, the Court takes Judicial Notice of the

had a hearing until 4:00 P.M. on the following Tuesday—*ten (10) days and eighteen (18) hours* after his initial detainment. That conclusion is based upon the following reasoning:

\* Time elapsed since detention at 10:00 p.m. Friday:

| | | |
|---|---|---|
| Friday: | 2 hours | |
| Saturday: | 24 hours | (excluded as weekend) |
| Sunday: | 24 hours | (excluded as weekend) |
| Monday: | 24 hours | (excluded as holiday) |
| Tuesday: | 24 hours | |
| Wednesday: | 24 hours | |
| Thursday: | 16 hours | |
| Total | 138 hours | from initial detention until petition filed. |

| | | |
|---|---|---|
| Thursday: | 8 hours | |
| Friday: | 24 hours | |
| Saturday: | 24 hours | (excluded as weekend) |
| Sunday: | 24 hours | (excluded as weekend) |
| Monday: | 24 hours | |
| Tuesday: | 16 hours | |
| Total | 120 hours | from filing of petition to hearing. |

This would mean that a total of 258 hours (138 plus 120) would have elapsed from initial detention until hearing. Ten (10) days would amount to only 240 hours.

(d) If it be assumed that a petition is filed on the subject at the *first available opportunity* as required under *Wessel* (*i.e.*, within the first 24 hours following detention, excluding weekends and holidays) by, for example, 4:00 p.m. on the following Tuesday, the subject could be "legally" detained without having had a hearing only until 4:00 p.m. on the next day (Wednesday) (*i.e.*, within 24 hours, excluding weekends and holidays, of the filing of the petition)—only *four (4) days and eighteen (18) hours* after his initial detainment. That conclusion is based upon the following reasoning:

\* Time elapsed since detention at 10:00 P.M. Friday:

| | | |
|---|---|---|
| Friday: | 2 hours | |
| Saturday: | 24 hours | (excluded as weekend) |
| Sunday: | 24 hours | (excluded as weekend) |
| Monday: | 24 hours | (excluded as holiday) |
| Tuesday: | 16 hours | |
| Total | 90 hours | from initial detention until petition filed. |

| | | |
|---|---|---|
| Tuesday: | 8 hours | |
| Wednesday: | 16 hours | |
| Total | 24 hours | from filing of petition to hearing. |

fact that probate courts are normally not open for business at that hour. Hence, in the example, the Court will assume that the petition is filed by 4:00 p.m.—approximately an hour before the normal closing time of probate court offices. It should be noted, however, that if a defendant

This would mean that a total of 114 hours (90 plus 24) would have elapsed from initial detention until hearing. Five (5) days would amount to only 120 hours.

The example makes clear that it is possible—even predictable—that a person can and may be held longer than times permitted by *Wessel* without a petition being filed and a hearing being had if the provisions of the current statute are allowed to stand and be followed.

10. Ordinarily, a Court should not and will not reach a constitutional question if the case before it can be properly decided without doing so. However, in this case it is urged that plaintiff was detained in violation of his right to due process as guaranteed by the federal constitution. Accordingly, in order for the Court to resolve that claim, it is necessary for the Court to determine what those rights are—and what they are not. As indicated above, the Court believes the appropriate standards for due process in an involuntary civil commitment case are those laid out in *Wessel* and *not* those laid out in the statute.

Although, as stated later, the Court believes plaintiff was *not* denied due process in this case, the Court cannot conclude that the present statute is *not* unconstitutional on its face. This follows since—unlike *before* the decision in *Wessel*—we now have precedent (*Wessel*) in place prescribing what the minimum requirements are for due process and to the extent the statute does not comply with that precedent, it must not be allowed to stand.

■ It is, therefore, necessary for this Court to declare that to the extent the provisions of Ark.Code.Ann. §§ 20–47–201, *et seq.* conflict with requirements of *Wessel* concerning time frames within which petitions must be filed and hearings must be accorded, they

is detained anytime before the hour of 5:00 p.m. on a given day, it would be possible that said defendant could be "legally" held without a petition being filed for the full times contemplated by either *Wessel* or the statute.

are in violation of the due process guarantees of the federal constitution and are declared to be void.

■ 11. It does not necessarily follow from what has been said that plaintiff's constitutionally protected rights to due process of law have been violated by his incarceration and handling at GCDC. To the contrary, the Court believes that his rights were not so violated. Using the Court's previous example as a model and examining plaintiff's experience under the provisions of *Wessel*, it can readily be seen that plaintiff was accorded proper due process in the matter:

Plaintiff was detained at GCDC at 2:19 a.m. on Saturday, May 14, 1994. The following Monday was *not* a legal holiday.

(a) Under *Wessel*, plaintiff could have been "legally" held—at least in theory [3]—until Midnight the following *Monday* night without a petition being filed. That conclusion is based upon the following reasoning:

* Time elapsed since detention at 2:19 a.m. Saturday:

| | | |
|---|---|---|
| Saturday: | 21 hours, | 41 minutes (excluded as weekend) |
| Sunday: | 24 hours | (excluded as weekend) |
| Monday: | 24 hours | |
| Total | 69 hours, | 41 minutes. |

(b) If, as was the case here, the petition concerning plaintiff was filed during the morning of Monday, May 16, 1994—say approximately 10:00 a.m.—plaintiff could have been "legally" detained without having had a hearing until 10:00 a.m. on the next day (*i.e.*, Tuesday, May 17, 1994). That conclusion is based upon the following reasoning:

* Time elapsed since detention at 2:19 a.m. Saturday:

| | | |
|---|---|---|
| Saturday: | 21 hours, | 41 minutes (excluded as weekend) |
| Sunday: | 24 hours | (excluded as weekend) |
| Monday: | 10 hours | |
| Total | 55 hours, | 41 minutes from initial detention until petition filed. |

* Time elapsed since petition filed at 10:00 a.m. Monday:

| | | |
|---|---|---|
| Monday: | 14 hours | |
| Tuesday: | 10 hours | |
| Total | 24 hours | from filing of petition until hearing held. |

**3.** Again, as a practical matter, a petition would have to be filed prior to 5:00 p.m. since the

Under the foregoing analysis, a total of 79 hours and 41 minutes (55 hours, 41 minutes plus 24) could have elapsed from plaintiff's initial detention until his hearing and the due process requirement of *Wessel* would have been met.

It appears that the petition on plaintiff was filed before 10:00 a.m. on Monday, May 16, 1994, since he was seen by a counsellor, given a hearing, and then released all before 1:00 p.m. on that same Monday, May 16, 1994. Accordingly, it can easily be seen that a petition on plaintiff was filed at the "first available opportunity" (*i.e.*, within 24 hours of his detention, exclusive of the weekend) and that he was given a hearing and was released at his "initial appearance" which was accorded to him well within 24 hours after the petition was filed.

12. Based upon the foregoing reasoning and analysis, the Court concludes that plaintiff's rights to due process of law were not violated by defendants and that his complaint against them is without merit as a matter of law. It follows that plaintiff's request for injunctive relief should and will be denied. It also follows that plaintiff's claims for damages, fees, costs and other relief also should and will be denied.

13. The Court observes, in passing, that it believes defendant police officers acted properly in their handling of plaintiff on the night of May 14, 1994. Their actions showed good judgment, restraint and common sense. While they would have been justified—on the bare facts—in arresting plaintiff and charging him with any one of a number of criminal offenses by reason of his dangerous shooting and disturbing conduct, they chose to handle him with compassion and understanding and tried to get him some help for what they perceived to be an apparent mental problem. It is clear to the Court that plaintiff's conduct on the night in question was dangerous both to himself and others and that the police officers definitely did the right thing by taking him into custody. It could even be

probate courts are not normally open thereafter.

said—not in the way of criticism but only to point out commendable restraint—that defendant police officers would have been fully justified in arresting and charging plaintiff based upon their first visit to his home on the night in question.

14. The Court will also make one final observation in the hope that no misunderstanding will result when one reads the *Wessel* decision and this decision: When it is said that the Arkansas Legislature is free to "formulate alternatives which *go beyond* the minimum constitutional standard specified (in *Wessel* )" the import of that comment is that any such alternative may accord *more* due process (*e.g.,* by requiring petitions to be filed *sooner*; or by requiring hearings to be conducted *sooner* )—and not *less* due process (*e.g.,* by permitting a longer time in detention before a petition has to be filed; or by permitting a longer time in detention after a petition has been filed but before a hearing has been conducted). In other words, in order to "go beyond" the minimums required in the context of this discussion, the time frames for certain actions must be shortened and not expanded. One might even analogize the concept to a golf score: in order to *improve* it, one attempts to *lower* it rather than to *increase* it.

IT IS THEREFORE ORDERED that, based on the foregoing, plaintiff shall take nothing against defendants on his complaint against them and judgment will be entered accordingly;

IT IS FURTHER ORDERED that, to the extent the provisions of Ark.Code Ann. §§ 20–47–201, *et seq.,* conflict with the holding in *Wessel v. Pryor,* 461 F.Supp. 1144 (E.D.Ark.1978) as to the time frames which are necessary to accord minimum due process to a person with respect to whom involuntary civil commitment proceedings are commenced, they are hereby declared to be violative of due process of law as guaranteed under the federal constitution and, therefore, are declared to be void;

IT IS FURTHER ORDERED that the mandate of *Wessel v. Pryor,* supra, be, and it hereby is reaffirmed with the effect that the requirements laid down therein as the minimum necessary for the due process in invol-

untary civil commitment proceedings shall still be such until the Arkansas Legislature shall act as contemplated and permitted by that decision. In so ordering, this Court also reaffirms Judge Eisele's statements in *Wessel* to the effect that what the policies and procedures of the State of Arkansas shall be with respect to involuntary civil commitments of mentally ill persons are—in the first instance—issues and matters of legislative concern and prerogative which should be resolved by the General Assembly of the State of Arkansas.

IT IS SO ORDERED AND ENTERED.